## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

AUSTIN BOND, as Special Administrator
of the Estate of Mitchell Lee Godsey,

        Plaintiffs,

v.

                                      Case No. 18-CV-231-GKF-CDL

VIC REGALADO, in his official capacity,
*et al.*,

        Defendants.

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Doc. 115] of defendant Seth
Whitman. For the reasons set forth below, the motion is granted.

### I. Background

This civil rights action arises from the death of Mitchell Lee Godsey during his detention
at the David L. Moss Criminal Justice Center (DLM) in Tulsa, Oklahoma. On April 25, 2018, Mr.
Godsey's estate brought this action against Tulsa County Sheriff Vic Regalado, in his official
capacity; the Board of County Commissioners of Tulsa County; Armor Correctional Health
Services, Inc. (Armor); Angela McCoy, LPN; Curtis McElroy, D.O.; and Seth Whitman, LPN.
[Doc. 2]. Mr. Godsey's estate initially asserted three claims: (1) deliberate indifference to a serious
medical need in violation of the Fourteenth and/or Eighth Amendment (42 U.S.C. § 1983), (2)
negligence; and (3) violation of Article II § 9 of the Oklahoma Constitution. [Docs. 2, 3].

The court previously dismissed all but the § 1983 claim against Whitman, Sheriff Regalado
(in his official capacity), and Armor. [Docs. 55, 58, 59]. Whitman now moves for summary
judgment. [Doc. 115].

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court "view[s] the facts in the light most favorable to [plaintiff] and resolve[s] all factual disputes and reasonable inferences in [its] favor." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1209 (10th Cir. 2019) (quoting *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018)).

## III.  Undisputed Material Facts[1]

At the time of the events involved in this lawsuit, Mr. Godsey was a fifty-nine year old Type 2 Diabetic with insulin resistance. [Doc. 115, p. 13, ¶ 51; Doc. 115-1; Doc. 124, p. 18, ¶¶ 51-52]. His diabetes was not well controlled. [Doc. 115, p. 13, ¶ 52; Doc. 124, p. 18, ¶¶ 51-52].

On July 30, 2016, Mr. Godsey was arrested and booked into DLM at 4:53 p.m. [Doc. 115, p. 7, ¶ 1; Doc. 115-1; Doc. 124, p. 7, ¶ 1]. At 7:00 p.m., DLM nursing staff recommended that Mr. Godsey be sent to the OSU Medical Center Hospital based on low blood sugar and related symptoms.[2] [Doc. 115, p. 7, ¶ 2; Doc. 115-3, p. 4; Doc. 124, p. 7, ¶ 2]. Mr. Godsey arrived at the OSU Medical Center by ambulance at 8:13 p.m. [Doc. 115, p. 7, ¶ 3; Doc. 124, p. 8, ¶¶ 3-4; Doc.

---

[1] Federal Rule of Civil Procedure 56 provides that a party opposing summary judgment and arguing that a material fact is genuinely disputed must support that contention either by citing to materials in the record supporting a genuine factual dispute or by showing that the material in the record does not establish the absence of a genuine dispute. Any fact not specifically disputed in accordance with this standard will be considered undisputed for purposes of this motion. Fed. R. Civ. P. 56(e)(2).

[2] The OSU Emergency Room Report states that Mr. Godsey was "acting funny at the jail, they took his blood sugar and it was initially 60. At that point, they gave the patient Decadron as well as called EMSA. When EMSA arrived, the patient's blood sugar had improved to 106 and he was given an amp of D50, which brought his blood sugar up to 208. The patient is awake, alert, and they feel like he is still acting funny." [Doc. 115-4, p. 1]. The Report states that Mr. Godsey had a medical history of diabetes. [*Id.*].

124-7, p. 1]. At 9:11 p.m., Mr. Godsey was discharged from OSU Medical and returned to DLM. [Doc. 115, p. 7, ¶ 4; Doc. 124, p. 8, ¶¶ 3-4].

Upon his return, the DLM booking nurse—Angela McCoy—determined that Mr. Godsey needed to go to the infirmary rather than the general population. [Doc. 115, p. 7, ¶ 6; Doc. 124, pp. 9-10; ¶¶ 5-8]. McCoy believed that Mr. Godsey would be safer in the infirmary because it had equipment to monitor Mr. Godsey's blood sugar and he would have access to sack lunches in case of low blood sugar. [Doc. 115, p. 8, ¶ 7; Doc. 124, pp. 9-10, ¶¶ 5-8].

The next day, July 31, 2016, Nurse Seth Whitman worked the day shift at DLM from 7:00 a.m. to 7:00 p.m.[3] [Doc. 115, p. 9, ¶ 15; Doc. 124, p. 11, ¶¶ 15-16]. At 7:06 a.m., Whitman was briefed on Mr. Godsey's medical issues. [Doc. 115, p. 9, ¶ 16; Doc. 129-1, p. 3, ¶¶ 15-16]. Later that morning, Whitman checked Mr. Godsey's blood sugar, and the reading was 50 mg/dL.[4] [Doc. 115, p. 9, ¶ 18; Doc. 129-1, p. 3, ¶ 18]. In response to Mr. Godsey's blood sugar reading, Whitman gave Mr. Godsey two glucose tabs and a sack lunch. [Doc. 115, p. 9, ¶ 19; Doc. 124, p. 12, ¶ 19].

Then, at 11:37 a.m., an inmate worker served Mr. Godsey his lunch. [Doc. 115, p. 9, ¶ 22; Doc. 124, p. 12, ¶ 22]. Approximately two hours later, at 1:36 p.m., Whitman checked Mr. Godsey's blood sugar, and the reading was 248 mg/dL. [Doc. 115, p. 9, ¶ 24; Doc. 124, p. 12, ¶ 24]. In response to the reading, Whitman administered 4 units of insulin to Mr. Godsey. [Doc. 115, p. 9, ¶ 24; Doc. 124, p. 12, ¶ 24]. Plaintiff's expert witness has testified that the type of insulin

---

[3] Whitman was employed as a Licensed Practical Nurse in the DLM medical unit. [Doc. 115-9, p. 2:5-7].

[4] The parties dispute the timing of this blood sugar check. Whitman contends it occurred between 9:15 a.m. and 9:18 a.m. [Doc. 115, p. 9, ¶ 18]. Plaintiff argues the timing is unclear because the medical record indicates that Whitman checked Godsey's blood sugar at 11:34 a.m. [Doc. 129-1, p. 3, ¶ 18]. Whitman contends that the later time was when he documented the care provided earlier. [Doc. 115, p. 9, ¶ 21]. This dispute is immaterial to Whitman's summary judgment motion.

given to Mr. Godsey peaks from one (1) to three (3) hours after administration. [Doc. 115, p. 10, ¶ 28; Doc. 124, p. 14, ¶ 28].

At 4:53 p.m., Detention Officer Mercer served Mr. Godsey his dinner tray. [Doc. 115, p. 10, ¶ 31; Doc. 124, p. 14, ¶ 31]. At 6:14 p.m., Whitman checked Mr. Godsey's blood sugar, and the reading was 306 mg/dL. [Doc. 115, p. 10, ¶ 34; Doc. 124, p. 15, ¶¶ 34-35]. In response, Whitman administered eight (8) units of insulin to Mr. Godsey. [*Id.*].

At 11:33 p.m., Detention Officer Mercer stopped in front of Mr. Godsey's cell. Mr. Godsey did not respond, so Detention Officer Mercer called down the hall to Detention Officer Palomares. [Doc. 115, p. 11, ¶ 43; Doc. 124, p. 17, ¶¶ 42-46]. Detention Officer Mercer then called out Mr. Godsey's name, tried to wake him, and checked his pulse. [Doc. 115, p. 12, ¶ 44; Doc. 124, p. 17, ¶¶ 42-46]. Officer Palomares called medical emergency over the radio. [Doc. 115, p. 12, ¶ 44; Doc. 124, p. 17, ¶¶ 42-46]. Nurse McCoy arrived to Mr. Godsey's cell and found Mr. Godsey unresponsive. [Doc. 115, p. 12, ¶ 45; Doc. 124, p. 17, ¶¶ 42-46]. 9-1-1 was called. [*Id.*].

At 12:13 a.m. on August 1, 2016, Mr. Godsey was pronounced dead. [Doc. 115, p. 12, ¶ 46; Doc. 124, p. 17, ¶¶ 42-46].

## IV.  Analysis

As an initial matter, Whitman argues he is entitled to qualified immunity. Whitman was, on July 31, 2016, employed as an LPN with Armor Correctional Health Services, Inc. at DLM. [*See* Doc. 115-9, p. 2:5-7].

In *Tanner v. McMurray*, 989 F.3d 860 (10th Cir. 2021), the Tenth Circuit unambiguously held that employees of a national private corporation providing medical services in a correctional institution cannot assert qualified immunity. The Tenth Circuit explained: "neither 19th century common law nor modern policy considerations support allowing private medical professionals

who are employees of a contractor that provides healthcare in jails or prisons to avail themselves of qualified immunity." *Tanner*, 989 F.3d at 870.

Whitman attempts to distinguish *Tanner* by relying on an opinion issued the same day, *Estate of Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021). But *Jensen* concerned a doctor who worked directly for the county on a part-time basis. *Jensen*, 989 F.3d at 855. The Tenth Circuit noted that he "essentially ran a two-man shop . . . when providing a discrete function to the prison." *Id.* at 856. "In this capacity, [he] does not resemble a private doctor working in a private firm." *Id.*

That is not the case here. Whitman worked for Armor, a private corporation, rather than the county. Accordingly, *Tanner* applies. Whitman is not entitled to qualified immunity.

The question, then, is whether there is evidence from which a reasonable jury could conclude that Whitman committed a constitutional violation. "The constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause." *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019). A medical provider being "negligent in diagnosing or treating a medical condition" does not rise to a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" do constitute a constitutional violation. *Id.* "To establish deliberate indifference . . . a plaintiff must satisfy an objective and subjective component." *Smith v. Allbaugh*, 987 F.3d 905, 910 (10th Cir. 2021).

### A. Objective Component

"The objective component of deliberate indifference is met if the 'harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause.'" *Burke*, 935 F.3d at 992 (quoting *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)). "[I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and

not solely 'the symptoms presented at the time the prison employee has contact with the prisoner.'"

*Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Mata*, 427 F.3d at 753). The

Tenth Circuit has "held that 'death, [is], without doubt, sufficiently serious to meet

the objective component.'" *Burke*, 935 F.3d at 992 (quoting *Martinez*, 563 F.3d at 1088) (alteration

original). Plaintiff presents evidence that Whitman caused Mr. Godsey's death by inappropriately

administering insulin.[5] [*See* Doc. 129-2, p. 19:2-8]. Death easily satisfies the objective component.

Alternatively, Mr. Godsey's diabetes satisfies the objective component. "[A] medical need

is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or

... is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention." *Quintana v. Santa Fe County Board of Commissioners*, 973 F.3d 1022, 1029 (10th Cir.

2020) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). Mr. Godsey's medical

records reflect that he had been diagnosed with and treated for diabetes. [*See e.g.*, Doc. 115-3, p.

3; Doc. 115-4, p. 1]. It is undisputed that Mr. Godsey's blood sugar readings were as low as 50

mg/dL and as high as 306 mg/dL on July 31, 2016. [*See* Section III, *supra*]. DLM's doctor, Dr.

McElroy, testified at his deposition that "[f]luctuating blood sugars, high and low, over time can

affect the heart, coronary disease, kidneys, kidney failure, peripheral vascular disease," and he

agreed that it can be deadly. [Doc. 124-8, p. 21:8-13]. Accordingly, there is evidence from which

a reasonable jury could find that Mr. Godsey's diabetes presented a sufficiently serious medical

need to satisfy the objective component. *See Chapman v. Santini*, 805 F. App'x 548, 556-57 (10th

---

[5] There is a genuine dispute as to this material fact. The Medical Examiner concluded Mr. Godsey died as a result of acute intoxication by methamphetamine. [Doc. 115-7, p. 1]. But according to plaintiff's expert, Dr. Daniels, "Mitchell Godsey died from a fatal hypoglycemic episode that resulted from inappropriate administration of insulin." [Doc. 129-2, p. 19:2-8].

Cir. 2020) (unpublished) (failure to appropriately treat poorly controlled diabetes caused inmate substantial harm).

### B. Subjective Component

With respect to the subjective component, "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Quintana*, 973 F.3d at 1029 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (emphasis original). But "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (internal quotation marks omitted). The Tenth Circuit requires "that such risks present themselves as 'obvious' to the so-called 'reasonable man.'" *Id.* (citing *Mata*, 427 F.3d at 752); *see also Burke*, 935 F.3d at 992 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]").

Plaintiff argues that Whitman "knew, or it was obvious, that he was not qualified, or even legally authorized, to provide insulin to Mr. Godsey without a doctor's order." [Doc. 124, p. 21]. Accordingly, plaintiff contends that, in administering insulin to Mr. Godsey without supervision or a doctor's order, Whitman knowingly disregarded a substantial risk of serious harm.

In support, plaintiff submits documentation from the Oklahoma Board of Nursing. [Doc. 124-12]. The Board determined that Whitman violated the Oklahoma Nursing Practice Act and Board Rules by (1) administering two glucose tabs without a Healthcare Provider order and (2) administering four and eight units of insulin in response to blood sugar results of 284 mg/dL and 306 mg/dL, respectively, without a Healthcare Provider order. [Doc. 124-12, p. 2, ¶¶ 2, 3].[6] More

---

[6] The Board also determined Whitman erred in failing to notify a Healthcare Provider of Mr. Godsey's blood sugar result of 50 mg/dL. [Doc. 124-12, p. 2, ¶ 2]. Plaintiff does not argue that this failure constituted a constitutional violation.

specifically the Board of Nursing found that Nurse Whitman violated 59 Okla. Stat. § 567.8(B)(3), (7), (8). Those sections provide that the Board can impose disciplinary action against a person pursuant to proof that the person: "[f]ail[ed] to adequately care for patients or to conform to the minimum standards of acceptable nursing or Advanced Unlicensed Assistant practice that, in the opinion of the Board, unnecessarily exposes a patient or other person to risk of harm;" "[i]s guilty of unprofessional conduct as defined in the rules of the Board;" and "[i]s guilty of any act that jeopardizes a patient's life, health or safety as defined in the rules of the Board[.]" 59 Okla. Stat. § 567.8(B)(3), (7), (8).

Second, plaintiff submits the deposition testimony of the jail's doctor, Dr. Curtis Eugene McElroy. Dr. McElroy was asked "Is it significant to you that an LPN chose to give insulin without a physician's order?" [Doc. 124-8, p. 19:8-10]. He responded "Yes." [*Id.*, p. 19:12]. He testified: "in the event that maybe I knew something [the LPN] didn't, or you know, my approach would have been different, I would have had them not given [the insulin], even though it was a very low dose." [*Id.*, p. 19:14-17].

Third, plaintiff includes deposition testimony of Angela Mariani. She explained that it's important, from a nursing perspective, to have a physician's order to administer insulin "to make sure [the nurse is] checking the blood sugar and administering insulin accordingly." [Doc. 124-13, p. 2:4-10].

But there is no dispute that Nurse Whitman believed there to be a physician's order for insulin. The following is an excerpt from Whitman's deposition:

> A    I gave him insulin because I thought – like why – kind of like why wouldn't I have given him insulin. There was an order, you know, to take care of his blood sugars.
>
> ***

> Because if we're treating for low blood sugars, we're definitely going to treat him for the high ones as well.

> Q     Okay. I – my question is – is it your testimony that you looked at Mr. Godsey's chart, believed that there was a current MAR for insulin, and that that's why you administered it to him?

> A     Absolutely.

[Doc. 115-9, p. 3:9-22]. And Mr. Godsey's medical records reflect that he was previously administered insulin according to a sliding scale at DLM.[7]  [*See, e.g.* Doc. 115-3, p. 3]. Further, plaintiff's expert, Dr. Daniels, testified that he has no medical criticisms of the physician order for a sliding scale Whitman believed was in place. [Doc. 129-2, p. 24:1-19].

Taking this evidence together, a reasonable jury could not conclude that Whitman's belief that there was a physician's order to treat Mr. Godsey's high blood sugars with insulin, especially in light of the previous sliding scale, amounted to more than negligence. And the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) (quoting *Perkins v. Kan. Dep't of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999)).

Plaintiff also argues that, by administering insulin to Mr. Godsey after meals rather than before, Whitman inappropriately administered the sliding scale he thought was in place. Dr. Daniels testified:

> Sliding scales are used preprandial; they're used prior to eating. In other words, if your blood sugar is 240, then you give 8 units of insulin at the time you're going to eat. The sliding scale that [Whitman] used was postprandial. It was an hour and a half, two hours after Mr. Godsey had eaten, at a time when food absorption has already taken place, blood sugars have peaked, and blood sugars will start – without insulin – start going down on their own. And so

---

[7] According to Whitman, "[s]liding scale refers to a standard order or set of instructions for selecting and administering insulin doses based on a specific blood sugar reading." [Doc. 115, p. 6 n. 1].

the whole idea of a sliding scale is that it's a preprandial, not a postprandial. And this sliding scale was used postprandial.

So Mr. Godsey's blood sugar was headed down even without the administration of insulin. And when you add insulin on top of blood sugar that's already peaked . . . [he] had not only his own insulin, but he also had insulin being given exogenously as well.

So it was inappropriate to use the sliding scale postprandial.

[Doc. 129-2, p. 21:9-22:4]. In Dr. Daniels's view, "[t]hat is a negligent thing to do, to give a sliding scale two hours after eating." [Doc. 115-11, p. 14:8-9]. From this testimony, a reasonable jury could easily conclude that Whitman incorrectly used the sliding scale he believed was in place. But there is no evidence from which a reasonable jury could conclude that doing so was "patently unreasonable," *see Smith*, 987 F.3d at 911, or that Whitman knew, or it was obvious, that doing so presented a substantial risk of serious harm to Mr. Godsey. *See Estelle*, 429 U.S. at 105-06 ("[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'").

In sum, while there is evidence from which a reasonable jury could conclude that Whitman's inappropriate administration of insulin caused Mr. Godsey's death, there is no evidence from which a reasonable jury could conclude that Whitman acted with deliberate indifference. Whitman is entitled to summary judgment.

**V.  Conclusion**

WHEREFORE, defendant Seth Whitman's Motion for Summary Judgment [Doc. 115] is granted.

IT IS SO ORDERED this 11th day of August, 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE